[Cite as *State v. Hadley*, 2013-Ohio-1942.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                  CASE NO.  9-11-30

     v.

DANIEL S. HADLEY,                      O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Marion County Common Pleas Court
Trial Court No. 10 CR 0292

**Judgment Affirmed**

Date of Decision:   May 13, 2013


APPEARANCES:

    *Sarah G. LoPresti*  for Appellant

    *Brent W. Yager and David J. Stamolis*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Daniel S. Hadley ("Hadley"), appeals the June 22, 2011 judgment of the Marion County Court of Common Pleas journalizing his conviction by a jury for one count of felonious assault with a deadly weapon and sentencing him to four years in prison.

{¶2} On June 8, 2010, at approximately 6:00 p.m., Donald Ayars ("Ayars"), an employee of the Federal Census Bureau approached Hadley's home in Marion, Ohio, to gather information for the 2010 Federal Census. Hadley had previously been nonresponsive to the Census questionnaire sent to his home. Ayars was sent to follow-up with Hadley and to attempt to gather the necessary information for the Census.

{¶3} Ayars walked onto the porch and knocked on the front door of Hadley's residence. Hadley answered the door and was initially friendly. However, after Ayars identified himself as a Census worker the situation turned hostile. Both Ayars and Hadley have very divergent accounts of the events that took place after this initial introduction as evidenced by the 9-1-1 calls placed by Hadley and by Ayars after the incident.

{¶4} The following is the transcript from the 9-1-1 call Hadley placed to the Marion City Police immediately after the altercation with Ayars.

**Dispatcher: Marion City Police and Fire.**

**Hadley:** Yeah, I got some mother fucker who just stepped up to my house and I beat him with a fuckin' bat and he ran out. And he's standing out here.

**Dispatcher:** Where's out here?

**Hadley:** Eh, 387 East Farming. Yeah. You guys need to send a car out here and stuff 'cause if he comes up in here again, I'm beating him bad.

**Dispatcher:** What's your name?

**Hadley:** Dan Hadley.

**Dispatcher:** Dan, what?

**Hadley:** Daniel Hadley. H—387 East Farming.

**Dispatcher:** Hadley, right?

**Hadley:** Yeah. Yeah, this mother fucker he's sitting out here— he's just sitting out here.

**Dispatcher:** What's your phone number, Dan?

**Hadley:** uh, 740-802-* * * *.

**Dispatcher:** Well, who is this dude?

**Hadley:** He said something about some fuckin' census thing. I told him myself, I (inaudible), get off the porch. And, uh, I came back in the door and he came right up on me in a couple of inches and stuff and I said get the fuck away from here. He stepped up into the door and stuff.

**Dispatcher:** White guy, black guy, what?

**Hadley:** White guy. He's about six foot, six two.

**Dispatcher:** What's he wearing?

**Hadley: He's sitting out here right now.**

**Dispatcher: Right, but what's he wearing?**

**Hadley: Blue cut-off jeans and a blue tee-shirt.**

**Dispatcher: You said he came into your house and then you hit him with a bat?**

**Hadley: Yeah. I opened the door, came inside the house and he stepped-in and stuff. I ended up (inaudible) him up, I hit him with everything I had. I don't know who the fuck this guy is and he ain't gonna come up in here.**

**Dispatcher: Alright. He's outside on the porch or on the street or something?**

**Hadley: He's across the street now and stuff. Now he's on the phone with somebody I don't know who, but you guys need to send a squad car out here now.**

**Dispatcher: So, you're going to stay—make sure you put the bat someplace when the officers get there 'cause they might not be too happy to you see with it.**

**Hadley: Uh huh. Oh, I'm inside the house, just sitting here watchin' T.V. mindin' my business. Alright, we'll I'm gonna be sitting here waitin'.**

**Dispatcher: Okay, I'll send somebody over.**

{¶5} The following is the transcript from the 9-1-1 call placed by Ayars

immediately after the altercation with Hadley.

**Dispatcher: Marion City Police and Fire.**

**Ayars: Yeah, I was just assaulted with a baseball bat at 387 East Farming Street.**

-4-

**Dispatcher:  Who is?**

**Ayars:  I was just assault with a baseball bat by the gentlemen that was at 387 East Farming Street.  He struck me with a baseball bat.**

**Dispatcher:  Are you still there?**

**Ayars:  Yeah.  I'm still here.  I'm across the street right now.**

**Dispatcher:  What's your name?**

**Ayars:  Donald Ayars, A-Y-A-R-S.**

**Dispatcher:  Alright, hold on just a second, Donald.**

**Ayars:  Thank you.**

**Dispatcher:  Sir?**

**Ayars:  Yes, ma'am.**

**Dispatcher:  Do you know the guy that lives there?**

**Ayars:  No, I work for the Department of Census and I came here to get a Census and he was verbally abusive and pushed me and he said something, he said step up here and I turned around and said "what" and he brought a baseball bat out from his front step from behind his door and he struck me with it.  Now, he's on the other line right now talking to police.  I was assaulted with a baseball bat.**

**Dispatcher:  (to another dispatcher) Uh, what's he on?**

**Ayars:  He's on, I don't know he's callin'—**

**Dispatcher:  Nah nah nah no—not you.  Alright.  We'll have an officer down, okay?  What are you wearing?**

**Ayars: I've got a blue tee-shirt on with blue shorts. I got a black bag on that says "Census."**

**Dispatcher: Ok. We'll have an officer down. Thanks.**

**Ayars: Bye.**

{¶6} Shortly after the 9-1-1 calls were made, the police arrived on the scene and interviewed both Hadley and Ayars. The police also spoke to a neighbor across the street and Hadley's girlfriend, who was inside the house at the time of the incident.

{¶7} On June 10, 2010, Hadley was indicted on one count of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2), a felony of the second degree.

{¶8} On August 5, 2010, the prosecution filed a supplemental indictment listing a second count of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2), a felony of the second degree.

{¶9} On August 9, 2010, Hadley was arraigned and entered a plea of not guilty.

{¶10} On August 16, 2010, the prosecution filed a bill of information specifying a third count for attempted aggravated assault, in violation of R.C. 2923.02 and R.C. 2903.12(A)(2), a felony of the fifth degree.

{¶11} On August 17, 2010, Hadley entered a guilty plea to Count Three listed in the bill of information, attempted aggravated assault, in exchange for the prosecution dismissing the two counts of felonious assault.

{¶12} On October 21, 2010, Hadley filed a pre-sentence motion to withdraw his guilty plea, which was subsequently granted by the trial court. The case proceeded to trial on Count One of the indictment, felonious assault.[1]

{¶13} On May 26, 2011, Hadley filed a request for jury instructions. Specifically, Hadley requested the trial court to instruct the jury on the affirmative defense of self-defense and the presumption of self-defense stated in R.C. 2901.05(B)(1), commonly known as the "Castle Doctrine."

{¶14} The case proceeded to a jury trial on June 1, 2011. The prosecution played the 9-1-1 calls placed by both Hadley and Ayars after the incident. The prosecution also presented the testimony of Ayars, Heather Schilling—the neighbor who lives across the street from Hadley, and Officers Cox and Burdick— the two police officers who responded to the 9-1-1 calls. Hadley testified on his own behalf and also offered the testimony of his live-in girlfriend, Donita Valdez. The prosecution recalled Officer Cox on rebuttal and played the recorded

---

[1] It is not clear from the record why the prosecution chose to indict Hadley on two counts of felonious assault. Nevertheless, it is evident that after the trial court granted Hadley's pre-sentence motion to withdraw his guilty plea, the prosecution only chose to take Count One to trial. Notably, neither Hadley nor the prosecution raise any issue with regard to this decision in the record or on appeal.

statements he took from Heather Schilling immediately after the altercation between Hadley and Ayars.

{¶15} Prior to instructing the jury, the trial court overruled Hadley's request to instruct the jury on the presumption of self-defense set forth in R.C. 2901.05(B)(1), concluding that the Castle Doctrine was inapplicable to the facts of this case. However, the trial court did instruct the jury on the affirmative defenses of self-defense and defense of another.

{¶16} After hearing the evidence, the jury found Hadley guilty of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2). On June 22, 2011, the trial court sentenced Hadley to serve four years in prison and imposed a mandatory three years of postrelease control.

{¶17} It is from this judgment that Hadley now appeals, asserting the following assignments of error.

<u>ASSIGNMENT OF ERROR NO. I</u>

**THE TRIAL COURT ERRED AND DENIED DANIEL HADLEY DUE PROCESS OF LAW WHEN IT FAILED TO PROVIDE THE JURY WITH A PROPER JURY INSTRUCTION IN ACCORDANCE WITH R.C. 2901.05. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.**

<u>ASSIGNMENT OF ERROR NO. II</u>

**THE TRIAL COURT VIOLATED DANIEL HADLEY'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN, IN**

**THE ABSENCE OF SUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IT ENTERED A JUDGMENT CONVICTING MR. HADLEY OF FELONIOUS ASSAULT. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITES STATES CONSTITUTION; SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION; R.C. 2901.05.**

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED THE ADMISSION OF HIGHLY PROBATIVE, ADMISSIBLE EVIDENCE, AND THUS IMPEDED MR. HADLEY'S ABILITY TO DEFEND HIMSELF AGAINST THE CHARGES LEVIED AGAINST HIM, IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.**

## ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT VIOLATED DANIEL HADLEY'S RIGHT TO CONFRONT A WITNESS AGAINST HIM WHEN IT ALLOWED THE JURY TO HEAR A WITNESS' RECORDED STATEMENT WITHOUT ALLOWING THE DEFENSE AN OPPORTUNITY TO CROSS-EXAMINE. SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.**

{¶18} For ease of discussion, we elect to discuss Hadley's assignments of error out of order.

### *First Assignment of Error*

{¶19} In his first assignment of error, Hadley claims that the trial court erred when it overruled his request to instruct the jury on the presumption of self-

defense codified in R.C. 2905.01(B)(1), commonly referred to as Ohio's version of the Castle Doctrine. The following facts, which are dispositive to our determination of this matter on appeal, were elicited at trial.

{¶20} Ayars testified for the prosecution and stated that he approached Hadley's front door and rang the doorbell. After hearing no response, Ayars began to leave the premises when Heather Schilling, the neighbor who lives across the street, informed him that Hadley's doorbell did not work and that he should try knocking. Ayars again approached Hadley's front door this time knocking. Ayars recalled that Hadley subsequently answered the door. Ayars testified that when he identified himself as a Census worker, Hadley immediately became "vulgar" and shoved him into the iron porch railing. Ayars recalled that he was trapped on the porch against the iron railing and that he had no choice but to walk by the front door to exit down the porch steps. Ayars recalled that the only other way he could have exited the porch was to jump over the iron railing.

{¶21} Ayars explained that as he tried to exit the porch down the steps, Hadley reached around his front door, grabbed an aluminum baseball bat and came at Ayars with the bat. Ayars testified that Hadley then swung the bat overhead and hit Ayars on the left forearm. Ayars claimed that he used his forearm to block Hadley from striking him in the head with the bat. Ayars then ran down the porch steps and called the police.

{¶22} Ayars maintained that he did not step or look into Hadley's home. Ayars also maintained that he did not swing his fists towards Hadley, swear at Hadley or have any weapons on his person. Ayars described himself as wearing jean shorts, a blue T-shirt and carrying a black bag containing his Census forms. Ayars testified that he went to the emergency room after the incident and had an X-ray of his forearm taken. Ayars confirmed that he had no broken bones, but did receive a bruise as a result of the blow.

{¶23} On cross-examination, Ayars acknowledged he knew of at least one other Census worker who had unsuccessfully attempted to receive information from the Hadley residence. However, Ayars explained that he did not know this information until he looked at his paperwork on the Hadley residence after he approached the Hadley home. Prior to knocking on the door, Ayars testified that at the time he only knew that the Hadley residence was considered a "nonresponse" to the Census questionnaire.

{¶24} Ayars admitted that he was not wearing his Census identification badge at the time of the encounter with Hadley, and that he should have been wearing it. Ayars also admitted that upon Hadley's refusal to participate in the Census, he may have told Hadley "it will only take a moment," and that this action was against the protocol issued by the Census Bureau, which required Census workers to thank an unwilling resident for their time and leave. However, Ayars

was adamant that Hadley told him to leave only after Hadley shoved Ayars into the iron railing and that Ayars did not have the opportunity to leave prior to Hadley striking him with the bat. On cross-examination, Ayars denied following Hadley up into the front door. Ayars testified that he believed Hadley was getting a gun when Hadley reached inside the home to the get the bat and that he was just trying to get off the porch after he was shoved by Hadley. Ayars recalled that the incident happened quickly and that he was on the porch for maybe ten seconds.

{¶25} Heather Schilling, the neighbor who lived across the street, also testified for the prosecution. Schilling testified that she was on her front porch when she saw Ayars walk up to Hadley's door. She admitted that she told Ayars to knock louder on the door. Schilling recalled that she went back inside her home and saw something swinging out of the corner of her eye. Schilling claimed that she then looked outside and noticed that Ayars had been hit with a baseball bat. Schilling testified that the entire altercation took place on Hadley's front porch. However, as discussed in more detail under the fourth assignment of error set forth below, Schilling's testimony was undermined somewhat by inconsistencies between her testimony at trial and prior recorded statements she gave to law enforcement at the time of the incident, which were also played at trial.

{¶26} Officer Cox of the Marion Police Department also testified for the prosecution. Officer Cox testified that he spoke to Hadley immediately after the

incident with Ayars. Officer Cox recalled Hadley's account of what had transpired. Specifically, Hadley relayed to Officer Cox that a Census worker came to his door, Hadley asked the Census worker to leave and turned around to walk back into his home. Hadley told Officer Cox that the Census worker then followed him into his home, Hadley felt threatened and swung the baseball bat, hitting the Census worker. Officer Cox also testified that Hadley claimed his girlfriend, Donita, also felt threatened by the Census worker.

{¶27} Detective Burdick of the Marion Police Department spoke to Ayars immediately after the incident with Hadley and testified for the prosecution. Detective Burdick testified that Ayars appeared to be "very shaken" after the incident and was in a "state of shock." (Tr. Trans. p. 209). Detective Burdick took a written statement from Ayars after the incident, in which Ayars recounted that Hadley shoved him with both hands, told Ayars "to get the fuck off of his porch," told Ayars to "step the fuck up in here" and then struck Ayars with a baseball bat. (Def. Ex. D). Detective Burdick also took pictures of Ayars' injury and various pictures of the scene, which were admitted at trial

{¶28} Hadley then testified in his defense. Hadley testified that at least two other Census workers had come to his home prior to Ayars. Hadley was not home on the first occasion, but on the second occasion he told the Census worker that he refused to participate in the Census and asked her to leave. Hadley

explained that he believed some of the questions asked in the Census were intrusive and that the data collected has been abused by the government.

{¶29} On the date of the altercation with Ayars, Hadley testified that he heard the knock on the door and answered the door. Hadley explained that he propped open the screen door and pulled shut the main door to the house behind him so that his dogs would not escape. Hadley recalled seeing Ayars on the front porch and seeing Schilling across the street in front of her house.

{¶30} Hadley testified that Ayars was not wearing anything identifying himself as a Census worker. However, Hadley also testified that Ayars did explain to him that he worked for the Census upon greeting him at the front door. Hadley recalled that at first Ayars was professional during their conversation. Hadley stated that he immediately told Ayars the same thing he had told the previous Census worker—that he was not participating in the Census and asked him to leave. Hadley testified that Ayars was nonresponsive to Hadley's request, stating that he only needed a few minutes of Hadley's time. Hadley testified that he "basically cut [Ayars] off" and told Ayars that he was not going to fill out the form and again asked Ayars to leave. (Tr. Trans. p. 234). Hadley stated that Ayars was still unresponsive to his request to leave and attempted to persuade Hadley to complete the form. Hadley admitted that at this point he began to get annoyed with Ayars. Hadley testified he then asked Ayars to leave a third time,

which invoked the same response from Ayars. Hadley recalled becoming rude and telling Ayars that he was not going to ask him again and "to get the fuck off the porch." (Tr. Trans. p. 235).

{¶31} Hadley claimed he then walked up to Ayars and put his hand on Ayars' back and gestured for Ayars to leave. Hadley denied shoving Ayars. At this point, Hadley maintained that Ayars "snapped" and "smacked" Hadley's hand away. (Tr. Trans. p. 236). Hadley claimed Ayars became very upset that Hadley had touched him and stated that if Hadley ever touched him again he would have him arrested for assault. Hadley stated that he was scared by Ayars' response, began to back up toward his front door, and then entered his home. Hadley explained that he kept a baseball bat near his front door for protection because he had been robbed four times in the past.

{¶32} Hadley admitted grabbing the bat and claimed he then took a defensive stance in the entry way of his home. Hadley testified that Ayars then advanced toward the doorway. Hadley claimed that as soon as Ayars' left foot crossed the threshold, he swung the bat hitting Ayars in the left forearm. Hadley claimed he did not swing the bat from overhead, but swung it in a lateral trajectory like a baseball swing. Hadley recalled that the bat struck Ayars in the forearm and came to rest in the doorjamb of the front door. Hadley testified that Ayars grabbed

his forearm, winced in pain and exited the house after being struck with the bat. Hadley then called the police to report the incident.

{¶33} Hadley testified that he felt threatened by Ayars' "irrational" behavior and believed that striking Ayars with the bat was his only alternative. However, Hadley admitted the thought that Ayars had a weapon never really crossed his mind. Hadley explained that he did not have enough time to shut the door to prevent Ayars from entering his home and he was afraid Ayars would overpower him and try to get into the home. Hadley described the whole altercation with Ayars occurring in a matter of minutes. More specifically, Hadley testified that it was just a matter of seconds, almost instant, between the time he entered his home and when he hit Ayars with the bat.

{¶34} Hadley's girlfriend, Donita Valdez, also testified for the defense. Valdez recalled hearing a knock at the door and Hadley getting up to answer it. Valdez described Hadley as propping open the screen door and shutting the main door behind him so their dogs did not escape. Valdez provided the following testimony regarding Ayars' attempt to enter the house.

> **Prosecutor: You say that Donald Ayars followed [Hadley] right in the house?**
>
> **Valdez: Right into the house.**
>
> **Prosecutor: How far in the house did he come?**
>
> **Valdez: Just—well, he was right behind [Hadley].**

**Prosecutor:  Did he ever take a step into the house?**

**Valdez:   Now, that's where I didn't see him because I turned away to look at [Hadley's] dog barking, and when I turned back [Ayars] was flailing his arms and I seen his feet going out the door, so in order for him to out backwards he had to have been in the house.  It's just logic.**

**Prosecutor:  But you didn't see him in the house?**

**Valdez:  No.**

(Tr. Trans. p. 274).  Valdez also testified that she was scared, and felt threatened and intimidated by the entire incident.

{¶35} At trial, based on the foregoing evidence, the trial court instructed the jury on the affirmative defense of self-defense as follows.

**The Defendant claims to have acted in self-defense.  To establish that he was justified in using force not likely to cause death or great bodily harm, the Defendant must prove by the greater weight of the evidence that**

**A.   He was not at fault in creating the situation giving rise to the alleged invasion of the Valdez and Hadley home by Donald Ayars; and**

**B.   He had reasonable grounds to believe, and an honest belief, even if mistaken, that he was in imminent danger of bodily harm.**

**The Defendant claims to have acted in defense of Donita Valdez. The Defendant had no greater rights than Donita Valdez and was justified in using force not likely to cause death or great bodily harm only if**

**A. Donita Valdez was not at fault in creating the situation giving rise to the alleged invasion of the Valdez and Hadley home by Donald Ayars; and**

**B. The Defendant had reasonable grounds to believe and an honest believe [sic], even if mistaken, that Donita Valdez was in imminent danger of bodily harm.**

**If either of these two elements is not proved, the Defendant had a duty to retreat. When less than deadly force is used, the Defendant has no duty to retreat.**

**Words alone do not justify the use of force. Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative.**

**In deciding whether the Defendant had reasonable grounds to believe, and an honest belief that he was in imminent danger of bodily harm, you must put yourself in the position of the Defendant, with his characteristics, and his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at that time. You must consider the conduct of Donald Ayars and decide if his acts and words caused the Defendant to reasonably and honestly believe that he was about to receive bodily harm.**

**The law does not nicely measure the degree of force which may be used to repel an attack. However, if the Defendant used more force than reasonably appears to be necessary under the circumstances, and if the force used is so greatly disproportionate to his apparent danger as to show an unreasonable purpose to injure Donald Ayars, then the defense of self-defense is not available.**

**If you find that the State has proved beyond a reasonable doubt all the essential elements of the offense charged in the indictment, _and_ the Defendant failed to prove the affirmative defense of self-defense by a preponderance of the evidence, your verdict must be guilty as to such offense according to your findings.**

**If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense charged in the indictment, _or_ the Defendant proved the affirmative defense of self-defense by a preponderance of the evidence, your verdict must be not guilty as to such offense according to your findings.**

(Tr. Trans. pp. 337-39) (emphasis added).

{¶36} The affirmative defense of self-defense requires the jury to consider Hadley's conduct in the altercation, including whether Hadley was at fault in creating the situation in which the force was used, whether Hadley had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm given the evidence of Ayars' conduct—and specifically whether Hadley was justified in using the amount of force he did against Ayars under the facts of this case. *See State v. Williford*, 49 Ohio St.3d 247, 249, (1990). Moreover, the affirmative defense of self-defense is not available to Hadley if the facts establish that Hadley used more force than reasonably necessary and if the force is greatly disproportionate to the apparent danger presented by Ayars. *Id.*, *see*, *also*, 2 *Ohio Jury Instructions*, Section CR-421.23 (2011).

{¶37} Notwithstanding the obvious rejection by the jury of Hadley's affirmative claim of self-defense pursuant to the foregoing instruction and the evidence in this case, Hadley argues on appeal that the trial court committed reversible error when it declined to also instruct the jury that Hadley was entitled

to a presumption of self-defense in accordance with R.C. 2901.05(B). In particular, R.C. 2901.05(B) provides the following.

> **(B)(1) Subject to division (B)(2) of this section, a person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.**
>
> **(2)(a)** *The presumption* **set forth in division (B)(1) of this section** *does not apply* **if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.**
>
> **(b)** *The presumption* **set forth in division (B)(1) of this section** *does not apply* **if the person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.**
>
> **(3)** *The presumption* **set forth in division (B)(1) of this section** *is a rebuttable presumption* **and** *may be rebutted by a preponderance of the evidence.*

R.C. 2901.05(B) (emphasis added.)

{¶38} Hadley maintains that the failure of the trial court to instruct the jury in this case on the presumption of self-defense contained in R.C. 2901.05(B)(1) constitutes prejudicial error because the outcome of the trial would have been different with the R.C. 2901.05(B) instruction. Specifically, Hadley argues that even though the evidence in this case was not sufficient to convince the jury of his affirmative defense of self-defense by a preponderance of the evidence, and even

though the jury found the prosecution's evidence was sufficient to establish the elements of felonious assault beyond a reasonable doubt, the jury could have found the prosecution's evidence was not sufficient to rebut the presumption of self-defense under R.C. 2901.05(B)(1) by a preponderance of the evidence. We disagree.

**{¶39}** In addressing Hadley's contention that the absence of the jury instruction on the presumption of self-defense in R.C. 2901.05(B)(1) constituted prejudicial error, we note that when reviewing a trial court's decision on a requested jury instruction, an appellate court must determine whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989); *State v. Collier*, 2d Dist. No. 20131, 2005–Ohio–119, ¶ 25. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, (1983). Moreover, in order to constitute reversible error, the appellant must demonstrate that he was prejudiced by the absence of the particular jury instruction requested. *State v. Comen*, 50 Ohio St.3d 206, 210 (1990). This inquiry is dependent on the particular facts and circumstances of each case. *See State v. Jackson*, 22 Ohio St.3d 281 (1986); *see*, *also*, *State v. Williford*, 49 Ohio St.3d 247 (1990).

**{¶40}** After the presentation of evidence and prior to the trial court instructing the jury, Hadley's counsel asked the trial court to instruct the jury on the presumption of self-defense in R.C. 2901.05(B)(1), also referred to as the "Castle Doctrine." The trial court overruled Hadley's motion and concluded the following.

> **The definition of the residence under this Castle Doctrine does include the front porch, there's no question that Mr. Ayars was privileged to be there as an Officer doing work for the Federal Government. Residence is not sub-divided in the statute. For those reasons the Castle Doctrine is not applicable. And the Motion of the Defendant is overruled.**

(Tr. Trans. p. 293).

**{¶41}** We note that the trial court properly determined that it was inconsequential to the application of R.C. 2901.05(B) whether the altercation between Hadley and Ayars occurred solely on Hadley's roofed porch, as Ayars contends, or whether Ayars actually attempted to enter Hadley's residence, as Hadley contends. Revised Code Section 2901.05(D) defines "residence" for the purposes of the presumption of self-defense in R.C. 2901.05(B)(1) as the following:

> **(2) "Dwelling" means a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance *includes, but is not limited to, an attached porch*, and**

-22-

**a building or conveyance with a roof over it includes, but is not limited to, a tent.**

**(3) "Residence" means a dwelling in which a person resides either temporarily or permanently or is visiting as a guest.**

R.C. 2901.05(D) (emphasis added).

{¶42} Nevertheless, as the basis for its ruling excluding the requested instruction, the trial court determined that Ayars had a privilege to be at Hadley's residence by virtue of his position as a Census worker. However, neither the trial court, nor the prosecution on appeal, cite to any authority supporting the conclusion that Ayars retained the privilege to remain at Hadley's residence after being told to leave by Hadley. Therefore, we believe the trial court's reliance on privilege was misplaced and that any privilege Ayars may have had to be at the Hadley residence was revoked when Hadley asked Ayars to leave.

{¶43} Notwithstanding our determination that the trial court's basis for denial of the instruction was misplaced, we still must determine whether the trial court's ruling was prejudicial to Hadley's case or whether it constituted harmless error. Criminal Rule 52(A) directs us to disregard "[a]ny error, defect, irregularity, or variance which does not affect [a defendant's] substantial rights." The term "affect a defendant's substantial rights" means " 'that the error must have been prejudicial. It must have affected the outcome of the [trial]

-23-

proceedings.' " (Emphasis omitted.) *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734 (1993).

{¶44} In order for the jury to convict Hadley of felonious assault with a deadly weapon, the jury had to not only find that the prosecution established all the elements of the offense beyond a reasonable doubt, *but also* that Hadley failed to prove his claim of self-defense by a preponderance of the evidence. When considering whether the facts at trial adequately established Hadley's claim of self-defense, the jury considered all of the evidence presented concerning the conditions and circumstances of the altercation between Hadley and Ayars.

{¶45} Therefore, when the jury entered its conviction, it concluded that Hadley failed to demonstrate even by a preponderance of the evidence that he was not at fault in creating the situation giving rise to the use force, that he had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm, and that the amount of force used was reasonable, necessary and proportional to the apparent danger.[2] In other words, the jury specifically assessed the reasonableness of Hadley's action in striking Ayars with a baseball bat. Thus, even assuming the jury found that Hadley was not at fault in creating the situation and that he had an honest belief that he was in imminent danger of bodily harm,

---

[2] We acknowledge that the jury was also instructed on Hadley's claim that he acted in defense of Donita Valdez, which requires the jury to conduct an analysis of the facts similar to Hadley's claim of self-defense. However, it is evident from the jury's verdict that it also concluded the evidence did not support Hadley's claim that he was justified in striking Ayars with the bat while acting in defense of Donita.

the jury had to still determine whether the evidence demonstrated that Hadley's immediate use of a baseball bat against Ayers was reasonably necessary under the circumstances and was proportionate to the apparent danger presented by Ayars' conduct.

{¶46} At trial, Hadley offered testimony attempting to establish the elements of self-defense. Specifically, Hadley testified that Ayars was the initial aggressor, was behaving irrationally and advanced through the doorway of the Hadley residence behind Hadley. Hadley tried to impress upon the jury that he was scared, threatened and intimidated by Ayars' stature, and felt that he had no other alternative but to strike Ayars with the baseball bat. However, the prosecution presented Ayars' testimony which rebutted the evidence presented by Hadley on all the elements of self-defense. In particular, Ayars testified that Hadley was the one who became enraged by another Census worker at his door step attempting to collect information. Ayars' presence on the porch caused Hadley to act out of rage and annoyance, which culminated in Hadley striking Ayars with the baseball bat.

{¶47} The evidence of Hadley's conduct immediately after the incident, as captured by his 9-1-1 call and by his own admissions at trial, showed that Hadley was extremely agitated and outraged by Ayars' presence on his front porch. Specifically, the undisputed testimony at trial established that Hadley struck Ayars

with the baseball bat shortly after Ayars identified himself as a Census worker. Both Hadley and Ayars testified that the entire incident, from the time Ayars knocked on Hadley's door to the time Hadley struck Ayars with the baseball bat, happened very quickly. Moreover, Hadley admitted that he never gave any thought to Ayers possessing a weapon. All of this made it far more rational for a jury to conclude that Hadley's immediate use of the baseball bat was motivated by fit a rage designed to get a despised Census worker off of his property rather than by the need to use whatever force was necessary to defend his home against an intruder intent upon entering Hadley's house to inflict imminent bodily harm upon Hadley or his girlfriend. *See Hilgefort v. Stewart*, 3d Dist. No. 17-10-13, 2011-Ohio-253, ¶ 14 (stating the affirmative defense of self-defense is "inappropriate if the force used is so grossly disproportionate as to show revenge or as criminal purpose").

{¶48} In sum, we believe that under the circumstances of this case, even as described by Hadley's version of events, no rational juror could have found that Hadley's use of a baseball bat against Ayers was reasonably necessary or proportionate to the apparent danger. As a result, as per the trial court's instruction, which followed the language of OJI, the defense of self-defense was *not available* to Hadley, meaning that no further analysis or consideration of any

of the remaining elements of self-defense by the jury was necessary or appropriate.[3]

{¶49} The jury determined that the evidence in this case established the elements of felonious assault beyond a reasonable doubt notwithstanding Hadley's version of events. As such, a rational jury could not have found that the same evidence which was sufficient to override and completely obviate any further consideration of Hadley's affirmative defense and sufficient to establish the elements of felonious assault by proof beyond a reasonable doubt, was somehow not sufficient to rebut a presumption of self-defense under R.C. 2901.05(B) by a mere preponderance of the evidence. This also means that any possible error in the trial court's comments to the jury regarding the duty to retreat, as noted by the dissent, would be harmless and could not have affected the outcome in this case or constituted reversible error, because no rational juror could have reasonably gotten that far in their consideration of the elements of self-defense in view of the excessive force used by the defendant.

{¶50} However, Hadley next argues that our analysis of the evidence, the common law elements of self-defense and our conclusions regarding his excessive use of force are all irrelevant because R.C. 2901.05(B) does not permit the jury to consider *his* conduct in the situation giving rise to his use of force against Ayars.

---

[3] *See 2 Ohio Jury Instructions*, Section CR-421.23 (2011).

Hadley would appear to concede that the presumption of self-defense under R.C. 2901.05(B)(1) is rebuttable as stated in R.C. 2901.05(B)(3).

**{¶51}** However, Hadley contends that R.C. 2901.05(B)(2) provides for only two narrow and specific grounds upon which the prosecution can rebut the presumption of self-defense set forth in R.C. 2901.05(B)(1). Thus, according to Hadley, under R.C. 2901.05(B)(2), the prosecution's rebuttal evidence in this case would be limited to either: a) proving by a preponderance of the evidence that Ayars was a lawful resident of Hadley's home; or b) proving by a preponderance of the evidence that Hadley was unlawfully and without privilege to be in his residence. It is undisputed that neither of these two scenarios is present in this case. Thus, Hadley argues that the prosecution could not have possibly rebutted the presumption of self-defense and, therefore, he would have been acquitted had the jury been instructed under R.C. 2901.05(B).

**{¶52}** It is clear from Hadley's argument that he interprets the language in R.C. 2901.05(B)(2) to provide the prosecution with two exclusive means of rebutting the presumption of self-defense stated in R.C. 2901.05(B)(1). However, we believe that Hadley is misconstruing the plain language of the statute in making this interpretation.

**{¶53}** The manner in which R.C. 2901.05(B) is structured is particularly instructive in resolving this matter. First, R.C. 2901.05(B)(1) describes the presumption of self-defense and the scenario in which it applies.

> **(B)(1) Subject to division (B)(2) of this section, a person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.**

R.C. 2901.05(B)(1).

**{¶54}** Next, R.C. 2901.05(B)(2)(a) and (b) set forth two threshold exceptions, delineating circumstances where the presumption of self-defense stated in R.C. 2901.05(B)(1) *does not apply*.

> **(2)(a) *The presumption* set forth in division (B)(1) of this section *does not apply* if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.**
>
> **(b) *The presumption* set forth in division (B)(1) of this section *does not apply* if the person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.**

R.C. 2901.05(B)(2)(a),(b) (emphasis added).

**{¶55}** Nothing in this language refers to circumstances which may be sufficient to *rebut* the presumption. On the contrary, these sections describe circumstances which negate the existence of the presumption itself. Thus, the

-29-

defendant is precluded from invoking and/or is not entitled to the presumption of self-defense if the person against whom the defensive force was used had a right to be in or was a lawful resident of the residence at issue, or if the defendant used the defensive force while he or she was unlawfully or without privilege to be in the residence.

{¶56} Finally, R.C. 2901.05(B)(3) clarifies that in cases where the presumption of self-defense stated in R.C. 2901.05(B)(1) *does apply*, the presumption is a rebuttable one and as such can be rebutted by the prosecution by a preponderance of the evidence.

> **(3) The presumption set forth in division (B)(1) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence.**

R.C. 2901.05(B)(3)

{¶57} The legislature dedicated an entirely separate section to the rebuttal provisions in R.C. 2901.05(B)(3). If the legislature had intended to specify the circumstances of sections R.C. 2901.05(B)(2)(a) and (b) as the exclusive means of rebuttal, it would have been easier and far more logical to include them under R.C. 2901.05(B)(3) pertaining to rebuttal, rather than immediately following (and hence likely intending to modify the application of) R.C. 2901.05(B)(1) creating the presumption itself. Clearly, reading the statute as Hadley argues blurs the contents

of R.C. 2901.05(B)(2) and R.C. 2901.05(B)(3), which are distinct and separate considerations under the statute.

{¶58} In addition, construing the statute to limit the prosecution in rebutting the presumption of self-defense by the use of only the two *status classifications* stated R.C. 2901.05(B)(2) effectively gives the defendant a *conclusive presumption* as to all of the *conduct-related elements* of self-defense. For instance, under Hadley's interpretation of the statute, the prosecution is precluded from *ever* rebutting the actual elements of self-defense with evidence that the defendant was not justified in using force or that the defendant used force unreasonably necessary and disproportionate to the apparent danger presented by the situation.

{¶59} This would mean that in every scenario in which the presumption of self-defense stated in R.C. 2901.05(B)(1) applies, the defendant is entitled to use *any* amount of force—even if it is unjustified or disproportionate to the apparent danger presented—against someone in his or her residence who is not privileged to be there regardless of the particular facts and circumstances of the situation. This produces an absolute license to commit any level of violence, including deadly force against any trespasser, immediately upon revoking their privilege to be there, and regardless of the circumstances.

{¶60} In this case, Hadley's interpretation of R.C. 2901.05(B)(2)(a) and (b) leads to the conclusion that he had the absolute right as a matter of law to shoot Ayers dead on his porch the instant he failed to honor Hadley's first request to leave without any examination of the circumstances or his conduct being admissible to rebut the presumption of self-defense, beyond the status classifications of R.C. 2901.05(B)(2)(a) and (b). We do not believe such an intent was contemplated by the legislature in promulgating the statutory scheme in R.C. 2901.05(B).

{¶61} Moreover, we note that other appellate districts have not limited their analysis to the two narrow exceptions Hadley advocates when considering whether the presumption of self-defense under R.C. 2901.05(B)(1) has been sufficiently rebutted. Instead, consistent with our reasoning outlined above, these courts have reviewed whether the *actual elements of self-defense* have been rebutted by the evidence in the record. *See e.g., State v. Petrone*, 5th Dist. No. 2011CA00067, 2012-Ohio-911, ¶ 73; *State v. Kolzlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, ¶¶ 26, 29 (8th Dist.).

{¶62} Therefore, we conclude that R.C. 2901.05(B) permits the prosecution to rebut the presumption of self-defense contained in R.C. 2901.05(B)(1) by demonstrating by a preponderance of the evidence that the

actual elements of self-defense were not established by the facts presented in a particular case.

**{¶63}** Accordingly, because under any version of the testimony, the evidence in this case establishes that the force used was disproportionate and excessive to any perceived threat, we conclude that the outcome of this case would not have been different even if the jury had been instructed on the presumption of self-defense in R.C. 2901.05(B)(1). The evidence presented at trial by the prosecution was adequate not only for the jury to conclude beyond a reasonable doubt that Hadley had committed the offense of felonious assault with a deadly weapon, but was also adequate to rebut Hadley's claim of self-defense by a preponderance of the evidence, and in turn was more than sufficient to rebut by a preponderance of the evidence the *presumption* that Hadley acted in self-defense under R.C. 2901.05(B)(1).

**{¶64}** Therefore, we conclude that under the particular facts and circumstances of this case, Hadley did not suffer prejudicial error when the trial court declined to instruct the jury on the presumption of self-defense in R.C. 2901.05(B)(1). *See State v. Jackson*, 22 Ohio St. 3d 281 (1986) (concluding that "a special instruction on appellant's duty to retreat when attacked in or about his home may have been helpful to the jury. Our review of the record, however, convinces us that the omission of such an instruction was not prejudicial error

-33-

requiring reversal under the facts of this case. * * * As demonstrated by the foregoing, the jury simply rejected appellant's theory of self-defense.").

{¶65} Hadley's first assignment of error is overruled.

*Third Assignment of Error*

{¶66} In his third assignment of error, Hadley argues that the trial court committed reversible error when it sustained the prosecution's objection excluding certain evidence regarding Ayars' mental health.

{¶67} We begin by acknowledging that a trial court has discretion to determine whether to admit or exclude evidence. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66 (1991). Therefore, an appellate court will not disturb a trial court's decision on the exclusion or admission of evidence absent an abuse of discretion. *Id*. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶68} On cross-examination, Hadley's attorney began to question Ayars about his mental health history. The prosecution objected to the line of questioning on the basis of Evid. R. 403(A), which provides, in pertinent part.

**Exclusion Mandatory**

**Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.**

{¶69} Outside the presence of the jury, defense counsel proffered the following statement as to the matters he wished to cross-examine Ayars about in front of the jury.

> **Well, Your Honor, he is, by his own admission, prescribed Seroquel, Flexatine, and Buspirone. These are medications used to treat schizophrenia, bipolar, depression and anxiety. Two of them are antipsychotic medications. Your Honor, clearly the witness has mental health issues and he can disclose to the jury exactly what they are and what effects they have on him. I know from my own research that schizophrenics have a tendency to become aggressive, they have violent mood swings, and certainly this is a situation that would cause him to engage in a mood swing. Bipolar people also have the tendency to have mood swings, and this is the sort of situation that a mood swing would arise.**

(Tr. Trans. p. 184).

{¶70} Nothing in the proffer indicated that Hadley's counsel intended to present any credible evidence, medical records or expert testimony beyond counsel's own questions and beliefs posed to Ayers in order to permit the jury to speculate how these medications *might have* influenced Ayars' conduct in the altercation with Hadley. As such, the "evidence" revealed in the proffer was at best speculative, and would require the jury to stack multiple inferences and to make assumptions about Ayars' mental health and its relevance to the particular facts of the case at hand. This would clearly present the danger of unfair prejudice, of confusion of the issues and of misleading the jury. *See Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 2001-Ohio-248 (stating that

"[u]nfair prejudice is that quality of evidence [that] might result in an improper basis for a jury decision").

**{¶71}** In addition, while on the stand, Hadley testified that Ayars "snapped" and became aggressive when Hadley touched his back and "gestured" to Ayars to leave his front porch. Hadley also repeatedly testified that he felt threatened, scared, and intimidated by Ayars advancing through his doorway because Ayars was behaving irrationally and is a bigger man than Hadley. Thus, the trial court's decision to exclude the proffered testimony regarding Ayars' mental health did not prevent Hadley from presenting evidence to support his version of events that Ayars was the initial aggressor.

**{¶72}** Therefore, we conclude that the trial court did not abuse its discretion when it excluded the proffered evidence of Ayars' mental health on the basis that its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

**{¶73}** Hadley's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶74}** In his fourth assignment of error, Hadley alleges that his Sixth Amendment right of confrontation was violated when the trial court allowed the jury to hear the recorded statements of Heather Schilling without providing

Hadley with the opportunity to cross-examine Schilling on these particular statements.

{¶75} The prosecution initially called Schilling to the stand in its case-in-chief. Schilling is the nineteen-year-old neighbor who lives across the street from Hadley and who claimed to have witnessed the altercation between Hadley and Ayars. Shortly after the incident, Officer Cox of the Marion City Police Department recorded statements Schilling made regarding her eye witness account. On direct examination, Schilling testified that the altercation between Hadley and Ayars occurred on the front porch of the Hadley residence. Schilling also stated that Ayars did not attempt to enter the Hadley residence, as Hadley contended.

{¶76} On cross-examination, Hadley's counsel asked Schilling about the recorded statements she made to Officer Cox—specifically, whether Schilling remembered stating that Hadley was inside his house at the time he struck Ayars with the baseball bat. On the stand, Schilling did not remember making this specific statement. Hadley's counsel then attempted to introduce and play Schilling's recorded statements for impeachment purposes. The prosecution objected to the recording on the basis that the defense had not yet shown Schilling made a prior inconsistent statement. The trial court overruled the objection and allowed the defense to continue with its line of questioning.

{¶77} The defense then chose to play isolated portions of the recording during which Schilling states that Hadley was in the doorway when Hadley struck Ayars. On the stand, Schilling again denied making this statement. Hadley's counsel then played another isolated portion of the recording during which Schilling states that Ayars did not step into Hadley's home, but "peeked" his head into the house. Schilling again denied making this statement on the stand. The defense played a third isolated portion of the recording during which Schilling again states that Ayars did not step into Hadley's house but "peeked" into the home and asked "how many people do you have in there." This time, Schilling admitted that it was her voice on the recording making this particular statement.

{¶78} The trial court then permitted the defense to question Schilling, over the objection of the prosecution, about other incidents not pertaining to this case. These incidents included an occasion on which Schilling allegedly shot Hadley's truck several times with a BB gun, and a separate occasion on which Schilling filed a report with the police accusing Hadley of Gross Sexual Imposition. Both of these incidents were introduced to demonstrate Schilling's bias against Hadley and to undermine her credibility on the stand. Once the defense finished its cross-examination, the prosecution posed no further questions to Schilling.

{¶79} After the defense rested, the prosecution called Officer Cox to the stand on rebuttal. The prosecution then sought to introduce and play Schilling's

entire statement recorded by Officer Cox, over Hadley's objection. The trial court overruled the objection based on the grounds articulated by the prosecution that Schilling's recorded statements were generally consistent with her prior testimony and that her overall prior recorded statement rebutted the limited excerpts presented by the defense. Thus, the entire 5:39 minute recording was played for the jury, which included the portions previously played by the defense for impeachment purposes.

{¶80} The remainder of the recording revealed that Schilling made statements indicating that Hadley was inside the door and that Ayars was on the porch when the alleged assault occurred. However, Schilling also made inconsistent statements on the recording by first stating she did not actually see Hadley strike Ayars with the bat, and then stating she "saw the whole thing." On cross-examination of Officer Cox, Hadley's counsel highlighted these inconsistencies in Schilling's testimony, which Officer Cox acknowledged.

{¶81} After reviewing the record, it is clear that significant inconsistencies between Schilling's testimony and her prior statements to police were thoroughly brought to light in front of the jury. Moreover, on balance, the trial court's decision to permit the prosecution to play Schilling's entire recorded statement on rebuttal only served to further undermine Schilling's credibility. Accordingly, we conclude that even if the trial court erred in not permitting Hadley to recross-

examine Schilling on these additional statements, the error was harmless and did not prejudice Hadley's defense.

{¶82} Hadley's fourth assignment of error is overruled.

*Second Assignment of Error*

{¶83} In his second assignment of error, Hadley argues that the jury's verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶84} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus (1981), superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶85} On the other hand, in order to determine whether a conviction is against the manifest weight of the evidence a reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the

evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). However, a new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id.* In addition, a reviewing court must allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶86} The jury convicted Hadley of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2), a felony of the second degree. Revised Code Section 2903.11(A)(2) states, in pertinent part:

**(A) No person shall knowingly * * ***

**(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.**

The term deadly weapon is defined in R.C. 2923.11(A) and means

**any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon**.

The term physical harm is defined in R.C. 2901.01(A)(3) and means

**any injury, illness, or other physiological impairment, regardless of its gravity or duration.**

{¶87} It is undisputed by the evidence presented at trial that Hadley struck Ayars with a baseball bat, which is a device capable of inflicting death and that

-41-

Hadley used the bat as a weapon against Ayars. It is also undisputed by the evidence presented at trial that Hadley caused Ayars physical harm when he struck Ayars in the forearm with the bat.

{¶88} Hadley's argument on appeal is that the jury's verdict was not supported by sufficient evidence and was against the manifest weight of the evidence. Hadley bases this argument on his contention set forth in his first assignment of error that the trial court erred when it declined to instruct the jury on the presumption of self-defense contained in R.C. 2901.05(B)(1). As previously discussed, Hadley contends that had the jury been instructed on this presumption of self-defense it would not have convicted him of felonious assault. Therefore, according to Hadley, the jury's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶89} However, in addressing Hadley's first assignment of error we concluded that he did not suffer prejudicial error by the trial court refusing to give the requested instruction because even if the instruction on the presumption of self-defense had been given, the outcome of the trial would not have been different. Accordingly, for this reason and based upon the evidence presented at trial, we find that the jury's verdict was supported by sufficient evidence and was not against the manifest weight of the evidence.

Case No. 9-11-30

{¶90} For all these reasons, the judgment is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**/jlr**

**ROGERS, J., dissents.**

{¶90} I respectfully dissent from the majority's opinion. In my view, the trial court erred in denying Hadley's request for a jury instruction on the Castle Doctrine, and erred in limiting Hadley's examination of Ayars. Further, contrary to the majority's determination, I find that these errors were not harmless, and consequently would reverse the trial court's judgment and order a new trial.

*Assignment of Error No. I*

{¶91} When instructing the jury, a trial court is required to provide the jury with a plain, distinct, and unambiguous statement of the law applicable to the evidence presented to the trier of fact. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12 (1985). The trial court must "give a complete or correct jury instruction on the elements of the offenses charged and the defenses thereto which are raised by the evidence * * *." *State v. Williford*, 49 Ohio St.3d 247, 252 (1990).

{¶92} The Castle Doctrine, codified in R.C. 2901.05, establishes a presumption in favor of one who acts in self-defense while lawfully occupying a residence as an owner or a guest.[4] R.C. 2901.05(B) provides as follows:

(B)(1) Subject to division (B)(2) of this section, a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

(2)(a) The presumption set forth in division (B)(1) of this section does not apply if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.

(b) The presumption set forth in division (B)(1) of this section does not apply if the person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.

(3) The presumption set forth in division (B)(1) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence.

R.C. 2901.05(D)(2) & (3) define the terms dwelling and residence as follows:

(2) "Dwelling" means a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance includes, but is not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent.

---

[4] R.C. 2901.05(B) applies equally to vehicles, but since this matter involves a residence we will limit our discussion to residences for the sake of clarity.

(3) "Residence" means a dwelling in which a person resides either temporarily or permanently or is visiting as a guest.

**{¶93}** Also pertinent to our discussion is R.C. 2901.09, which reads in its entirety:

(A) As used in this section, "residence" and "vehicle" have the same meanings as in section 2901.05 of the Revised Code.

(B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

The purpose of the doctrine and R.C. 2901.09 is to recognize the right of a person, lawfully in a residence, to defend themselves (and/or others) without resorting to attempts to retreat before using force against an aggressor.

**{¶94}** R.C. 2901.05(B)(2), meanwhile, defines only two circumstances under which the presumption will not apply. First, the presumption will not apply if the person against whom defensive force is used "has a right to be in, or is a lawful resident of, the residence." R.C. 2901.05(B)(2)(a). Secondly, the presumption will not apply if the person who uses the defensive force "is unlawfully, and without privilege to be, in that residence." R.C. 2901.05(B)(2)(b). If neither of these circumstances arise, however, the presumption of R.C.

2901.05(B) applies with full force. Without an instruction on the presumption there is not a complete or correct jury instruction.

{¶95} Here, the State has alleged that Hadley assaulted Ayars, and Hadley has argued that he acted in self-defense. While the trial court did instruct the jury on the defense of self-defense, it denied Hadley the presumption contained in R.C. 2901.05(B), and erroneously instructed the jury to consider whether Hadley had violated a duty to retreat.

{¶96} It was proven and, and even undisputed, that Hadley and Ayars were on a porch attached to Hadley's residence when Hadley told Ayars to leave. As such, Hadley was lawfully in his residence at the time of the alleged assault and Ayars' purported privilege was terminated when he was told to leave. From these undisputed facts, it is exceedingly clear that Hadley was entitled to a jury instruction on the Castle Doctrine and to the protection of rights that it affords. Therefore, failure to instruct the jury about the Castle Doctrine was unreasonable, arbitrary, and unconscionable.

{¶97} While I believe that the trial court's failure to instruct on the Castle Doctrine is itself reversible error, I also note that the trial court here compounded that error by erroneously instructing the jurors on the duty to retreat as it relates to the affirmative defense of self-defense. In proving this defense, the defendant typically has the burden to show by a preponderance of the evidence (1) that he

was not at fault in creating the violent situation; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the force used; and (3) that he did not violate a duty to retreat or to avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Evidence disproving one of these three enumerated conditions would usually effectuate a rebuttal. However, R.C. 2901.09 specifically provides that "a person who lawfully is in that person's own residence has no duty to retreat before using force in self-defense[.]" Therefore, when the Castle Doctrine presumption applies, it may only be rebutted by evidence demonstrating (1) that the person using defensive force was at fault in creating the situation; or (2) that the person using defensive force did not have a bona fide belief that he was in imminent danger of death or great bodily harm.

{¶98} The majority has concluded that the jury's verdict demonstrates that the jury rejected the affirmative defense of self-defense.

> * * * [W]hen the jury entered its conviction, it concluded that Hadley failed to demonstrate even by a preponderance of the evidence that he was not at fault in creating the situation giving rise to the use force, that he had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm, and that the amount of force used was reasonable, necessary and proportional to the apparent danger. In other words, the jury specifically assessed the reasonableness of Hadley's action in striking Ayars with a baseball bat. Thus, even assuming the jury found that Hadley was not at fault in creating the situation and that he had an honest belief that he was in imminent danger of bodily harm, the jury had to still determine whether the evidence

demonstrated that Hadley's immediate use of a baseball bat against Ayers was reasonably necessary under the circumstances and was proportionate to the apparent danger presented by Ayars' conduct. (Footnote omitted.) *Ante* at ¶ 45.

This view is misguided since the majority has failed to discuss, or even recognize, the trial court's erroneous instruction on the duty to retreat. The duty to retreat when in one's own home has been specifically and unequivocally rejected by the Ohio legislature, yet the trial court's instructions do not reflect this legislative rejection. As such, any instruction on an alleged duty to retreat was contrary to law, highly prejudicial, and irreparably tainted the proceedings to the point that this court cannot speculate on what weight the jury gave to this defective instruction.

{¶99} Furthermore, the majority has conjectured, without legitimate basis, as to what conclusions a reasonable juror would have reached had he or she received correct and complete instructions. However, it is not this court's prerogative, nor that of the trial court, to weigh the evidence and remove the factual issues from the jury. And to do so when the instruction was contrary to law is an outrage. The issue here is not what the majority feels is the correct outcome of the case. The issue is whether this defendant received a fair trial from a jury of his peers. The obvious answer is that he did not and this matter must go back so that he can receive a fair trial.

{¶100} For the foregoing reasons, I would find that the failure to instruct on the statutory presumption contained in R.C. 2901.05(B), without more, is reversible error. Further, in my view, this reversible error was rendered even more egregious by the trial court's erroneous inclusion of an instruction on the duty to retreat.

*Assignment of Error No. III*

{¶101} In his third assignment of error, Hadley argues that he was prejudiced by the trial court's refusal to allow him to question Ayars as to what medications he was taking, and the effects those drugs have on him. I agree.

{¶102} The trial court and the majority have concluded that the evidence of Ayars' mental health should be excluded on the basis that its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The majority also relies on the fact that the defense apparently had no expert available to testify on the matter. I fail to understand the logic.

{¶103} Who could better describe the effects medications have on Ayars than Ayars himself? Admittedly, the defense would be stuck with whatever answers Ayars provided, but that is the risk it takes. Ayars may have stated the drugs had no ill effects on him. On the other hand, he might have admitted to some adverse effect such as violent mood swings. Would such an admission be

prejudicial or confusing? I think not. In fact, such an admission would give credibility to Hadley's testimony about Ayars' conduct and diminish Ayars' credibility. While that might prejudice the State's case, it would not be unfair prejudice, and I fail to see how it would be confusing.

{¶104} I would find that the inquiry of Ayars as to his mental health and his medications was relevant and competent evidence and that the exclusion of that evidence was unfairly prejudicial to the defense.

{¶105} Accordingly, I would sustain Hadley's first and third assignments of error, reverse the conviction, and remand for further proceedings.